Filed 12/2/21  P. v. McCoy CA3

<u>NOT</u> <u>TO</u> <u>BE</u> <u>PUBLISHED</u>

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

THIRD APPELLATE DISTRICT

(San Joaquin)

----

| | |
|---|---|
| THE PEOPLE, | C090615 |
| Plaintiff and Respondent, | (Super. Ct. Nos. STK-CR-FE-COD-2014-0004732, SF126798A) |
| v. | |
| KALOM MCCOY, | |
| Defendant and Appellant. | |

This case involves the fatal shooting of Phi Vong that occurred while defendant Kalom McCoy was robbing Vong of a large quantity of marijuana.  Defendant contends his murder conviction must be reversed for insufficient evidence.  He argues the judgment must be reversed because the prosecution failed to disclose material information favorable to the defense (*Brady v. Maryland* (1963) 373 U.S. 83), and the trial court erred in admitting evidence that defendant's nickname was "Killa Kal."

We disagree with defendant's contentions on appeal.  We modify the judgment to correct an unauthorized sentence and otherwise affirm the judgment.

1

## FACTS AND PROCEEDINGS

*Murder of Phi Vong*

Walter Mims testified under a grant of immunity for the prosecution at defendant's trial. At trial, Mims and a number of other witnesses testified and introduced additional evidence as follows:

In the afternoon of December 16, 2013, Mims called Samuel Hall about buying marijuana. Jimmy Watkins had called Mims earlier that day about a buyer for 10 pounds of marijuana. Hall told Mims he could get marijuana for the deal. Mims called Watkins and said he had found a supplier for Watkins' buyer.

Hall, in turn, called David Groomes, who said he could supply that quantity and called Phi Vong to do so. Hall texted Mims to let him know that he had found a seller (Vong). Groomes and his wife picked up Vong and took him to Hall's house. Vong brought a box of marijuana into Hall's garage, where they stood waiting for the buyer.

Around 3:00 p.m., the buyer, referred by Watkins to Mims and whom Mims identified at trial as defendant, called Mims to set up the exchange. Defendant texted Mims around 4:00 p.m., and Mims met defendant at a fast food restaurant in Stockton. Mims got in defendant's car and showed him some samples of the marijuana. Mims told defendant the price was $16,000, which included $1,000 for Mims. Defendant asked Mims if there was a bank in the area where he could withdraw some money. Surveillance footage from a Raley's supermarket introduced at trial showed defendant and Mims entering the Raley's 26 seconds apart, and defendant withdrawing money from the ATM at approximately 5:10 p.m. The surveillance photos demonstrate that defendant was a heavyset, dark-skinned African-American man with no visible tattoos, scars, or hair on his head or face. He was wearing a long gold necklace and a gold wristwatch.

After Hall texted Mims to say he was ready, Mims met defendant at the Raley's. There was a light-skinned African-American man in his 20's with hair that was "just

2

becoming dreads" in the front passenger seat of the car.[1]  When he saw the passenger, Mims asked defendant, "What's going on?"  Defendant responded, "Well, you know, I got a lot of money on me.  I need somebody to protect me as well."

Defendant followed Mims to Hall's house; he parked on the opposite side of the street from the house and a few houses down the block.  Mims walked up to Hall and Groomes and said, "I'm with my people."  Mims then spoke to defendant at his car; the passenger was now in the backseat.  Mims told defendant to come into the house, but defendant refused, saying that he had $15,000 and did not trust anyone.  Defendant showed Mims some money.  Mims was concerned about this behavior because in his experience people got out of their cars to complete drug transactions.

Mims motioned for defendant to move his car so he was directly in front of Hall's driveway.  Vong handed Mims a plastic bag containing one pound of marijuana, which Mims brought to defendant's car.  Defendant checked the contents of the bag and showed Mims a freezer bag of money.  Defendant then held up the money towards Hall, Groomes, and Vong, who were standing in the driveway, indicating:  "I'm not trying to do anything to you all, I got plenty of money."  Mims did not speak to the car's passenger, the passenger did not have any money that Mims could see, and he was not part of the transaction as far as Mims was aware.

Mims brought the bag of marijuana back to the garage.  He advised Vong that he should not go to the car by himself, but Vong brought the box of marijuana to the car. Vong opened the front passenger door and handed the box to the driver.  The driver handed the box to the passenger in the backseat.

---

[1]  The passenger was later identified as codefendant Cahauri Williams, who was also charged in counts 1 and 2 and with firearm enhancements. (Pen. Code, § 12022, subd. (a).)  On March 14, 2016, Williams was sentenced to 12 years in prison after pleading no contest to voluntary manslaughter. (*Id*., § 192, subd. (a).)

Vong began struggling with the passenger over the box of marijuana at the open front passenger door. Vong was halfway in the car and yelling, " 'No,' 'stop,' 'no,' 'no,' " when defendant drove away fast with Vong at least partially inside.

The car stalled approximately 40 feet down the street. Vong pushed open the passenger door, fell or jumped out, and rolled in the street. He got up and went back toward the car; when he was at or close to the rear passenger door, the window rolled down seven or eight inches, and the passenger fired a gunshot from the vehicle. Vong had not opened the door, and he was not armed with a gun. Vong walked across the street and collapsed, and the car sped away. Mims fled as well. Mims called defendant as they were both driving away, and defendant wanted to know if people were "snitching" before hanging up on Mims.

Paramedics were dispatched to the scene at 7:33 p.m. and arrived five minutes later. Vong had been shot twice in his chest, and he had a grazing gunshot wound on his hand. He died at the scene.

Witnesses disagreed on the description of the car used in the robbery. Groomes told police it was possibly a black Altima, but at trial he testified that the car could have been a green or black Acura or Honda with tinted windows. Hall told police the car was a light green or dark blue Acura with tinted windows, and he testified that the car was a four-door dark blue or olive green car with tinted windows. In a call with Hall soon after the murder, Mims described the car as a "money green" Acura, and at trial he described the car as an Acura or older Mazda with a tail fin or spoiler. Groomes' wife testified that the car was green, but she did not remember whether the car had a spoiler.

4

*Police Investigation*

At the scene, Hall called Mims at the direction of law enforcement, and Mims told Hall that the buyer's name was "K" and gave him the buyer's phone number, which included a 650 area code. Mims told Hall that the driver was dark skinned, "heavyset" or "fat," and had no tattoos, marks, or hair on his face. A few hours after the murder, Groomes told officers, " '[i]f I could see that fat bastard right now, I would know who he is.' "

Detectives analyzed Mims' phone records and determined that Amad Samuels was his associate. Based on that analysis, detectives created a lineup containing a photograph of Samuels, which they showed to Groomes and his wife on December 18, 2013.[2] Groomes reviewed the lineup for a few minutes and requested and reviewed an additional lineup (that did not include Samuels). Then he identified Samuels as the driver of the car. Detective Miroslava Moreno, who showed the lineup to Groomes, testified that he pointed to Samuels' photograph and said, "[f]at, he's fat." Groomes' wife did not identify anyone in the lineup. A warrant was issued for Samuels' arrest, but officers were unable to locate him.

Mims was first interviewed by detectives on January 15, 2014. He acknowledged he was scared to speak to them but provided to them the same 650 number he provided to Hall as the buyer's number. He initially told detectives the buyer's name was "Jab" or "J," but he agreed that the buyer's name may have been "K" when confronted by detectives (who knew about "K" from the earlier directed call between Hall and Mims).

Detectives asked Mims about Samuels, whom Mims maintained was not involved in the robbery. Samuels drove a green Honda similar to the car described by witnesses to the murder, and his physical appearance was similar to the description given by witnesses

---

[2] The record does not reflect that the lineup also included defendant; it seems unlikely defendant was in the lineup, as he had not yet been identified as a suspect by detectives.

at the scene. Mims told Moreno that Samuels was heavyset and had a beard the majority of the time. At trial, Mims testified that Samuels was approximately five feet six inches tall, weighed approximately 250 pounds, and was a dark-skinned African-American man. Mims provided Samuels' phone number to the detectives, the records of which demonstrated that Samuels' phone was in Oakland throughout December 2013. After receiving the information regarding Samuels' phone, Moreno quashed the warrant as to Samuels.

Moreno obtained phone records for the 650 area code number Mims used to contact the buyer. Based on those records, Moreno narrowed her investigation to defendant. Detectives verified that defendant had gone into the Raley's on the day of the murder. A few days after his January 15, 2014, interview with law enforcement, Mims identified defendant as the driver and buyer in a lineup.

A warrant was issued for defendant's arrest. On January 22, 2014, an officer saw a green Acura parked in the driveway of defendant's house, and a black Lexus parked across the street. Defendant came out of the house and drove away in the Lexus. He was detained, and two cell phones were seized, one a gray HTC.

When law enforcement returned to defendant's house, the Acura was gone but was soon found in a nearby parking lot; it was unlocked with the key in the center console. A criminalist matched defendant's fingerprints to those found in the vehicle, as well as those of codefendant Williams,[3] but she was unable to match Vong's fingerprints. There was no blood in or on the car or any bullet holes or strikes. Officers searching

---

[3] The criminalist did not testify that she located Williams' fingerprints in or on the vehicle. However, both the prosecution and the defense in closing arguments agreed that the criminalist *did* find Williams' fingerprints on or in the car, and on appeal the parties agree that Williams' fingerprints were found on the car. Whether Williams' fingerprints were found on the vehicle does not affect our analysis.

6

defendant's residence found approximately one ounce of marijuana and marijuana residue on a digital scale.

Detectives determined that the number for the HTC phone had been changed from the 650 area code number to a 415 area code number on December 17, 2013, the day after the murder. In an interview, defendant stated that the phone number for the HTC phone was the 415 area code number, and he denied there was a previous phone number; he then said his previous number had a 209 area code.

Text messages on the HTC phone identified the user as "Kalom," "Killa," and "Killa K." A photograph taken on the phone on December 16, 2013, at 8:21 p.m.--approximately an hour after the murder--showed 10 clear plastic bags of marijuana with a bundle of money on top sitting on a tile floor. Groomes testified the bags looked like the bags he saw in Vong's possession, although he only saw one of those bags when Mims brought it to defendant's car.

A witness testified about the location and call activity of defendant's HTC phone and a different phone associated with Williams. The HTC phone called Mims' phone at 4:55 and 5:20 p.m. At 5:20 p.m., and between 6:50 and 6:54 p.m., the HTC phone accessed a cell phone tower near the Raley's where defendant was recorded by surveillance cameras. Between 7:02 and 7:31 p.m., that phone accessed cell phone towers near Hall's house. At 7:29, 7:31, and 7:33 p.m., that phone received calls from Mims' phone. From 8:01 to 9:30 p.m., the HTC phone and Williams' phone both accessed a cell phone tower near defendant's house.

*Witness Descriptions of the Driver at Trial*

At trial, Mims described the driver of the car as "kind of fat" or "heavyset" and said he did not have any hair; he identified defendant as the driver. Groomes testified that he selected Samuels out of the lineup based on his "body structure" because he did not see the driver's face. He testified that the driver was "big," and was a large African-American man with a lot of money in his hand and gold jewelry around his neck and

wrist.  Groomes also testified that the jewelry defendant wore in the photograph captured by Raley's surveillance cameras was similar to the jewelry he saw the driver wearing.  Hall could only recall that the driver "had more of a bigger frame," he "wasn't a small person, I know that," and he "took kind of more of the seat" and "took up more of everything."

*Procedural Background*

The jury found defendant guilty of first degree murder (Pen. Code, § 187, subd. (a); count 1),[4] and second degree robbery (§ 211; count 2), finding true the special circumstance charged as to count 1 for murder during the commission of a robbery (§ 190.2, subd. (a)(17)(A)).  The jury also found true that defendant was a principal, and a principal was armed with a firearm during the commission of the offenses.  (§ 12022, subd. (a)(1).)  The jury found defendant not guilty of being a felon in possession of a firearm.  (§ 29800, subd. (a)(1); count 3.)

The trial court sentenced defendant to life in prison without the possibility of parole for the murder, plus one year for the armed enhancement.  The court purported to suspend the sentence for the robbery.[5]

Defendant timely appealed.

## DISCUSSION

### I

*Sufficiency of the Evidence*

Defendant was prosecuted for first degree murder under a felony-murder theory.  On appeal, defendant contends his murder conviction must be reversed because there is

---

[4]  Further undesignated statutory references are to the Penal Code.

[5]  As we explain in part IV of the Discussion, *post*, the court failed to impose sentence on this count, improperly implementing section 654 by suspending imposition of the sentence rather than imposing and staying execution of the sentence.

insufficient evidence that he was a major participant in the robbery and acted with reckless indifference to human life. We disagree.

A. *Standard of Review*

" 'When considering a challenge to the sufficiency of the evidence to support a conviction, we review the entire record in the light most favorable to the judgment to determine whether it contains substantial evidence—that is, evidence that is reasonable, credible, and of solid value—from which a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt.' [Citation.] We determine 'whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.' [Citation.] In so doing, a reviewing court 'presumes in support of the judgment the existence of every fact the trier could reasonably deduce from the evidence.' " (*People v. Edwards* (2013) 57 Cal.4th 658, 715.)

" 'The same standard of review applies to cases in which the prosecution relies primarily on circumstantial evidence and to special circumstance allegations. [Citation.] "[I]f the circumstances reasonably justify the jury's findings, the judgment may not be reversed simply because the circumstances might also reasonably be reconciled with a contrary finding." [Citation.] We do not reweigh evidence or reevaluate a witness's credibility.' " (*People v. Houston* (2012) 54 Cal.4th 1186, 1215.)

The jury is entitled to draw reasonable inferences based on the evidence (*People v. Livingston* (2012) 53 Cal.4th 1145, 1166), and we must accept all logical inferences the jury might have drawn from the evidence, even if we would have concluded otherwise (*People v. Salazar* (2016) 63 Cal.4th 214, 242). " 'Although it is the jury's duty to acquit a defendant if it finds the circumstantial evidence susceptible of two reasonable interpretations, one of which suggests guilt and the other innocence, it is the jury, not the appellate court that must be convinced of the defendant's guilt beyond a reasonable doubt.' " (*People v. Zamudio* (2008) 43 Cal.4th 327, 357-358.) "A reversal for

9

insufficient evidence 'is unwarranted unless it appears "that upon no hypothesis whatever is there sufficient substantial evidence to support" ' the jury's verdict." (*Id*. at p. 357.)

B. *Applicable Legal Principles*

Our Supreme Court has set out the elements required to prove the felony-murder special circumstance in an aiding and abetting case such as this. (*People v. Clark* (2016) 63 Cal.4th 522, 615 (*Clark*).) The *Clark* court explained that "the actus reus for the felony-murder aider and abettor special circumstance requires more than simply being an aider and abettor of the underlying felony . . . . The special circumstance requires that the defendant be a ' "major participant" ' in the underlying felony. [Citation.] Likewise, the mens rea requirement for the felony-murder aider and abettor special circumstance . . . requires that the defendant have ' "reckless indifference to human life" ' " rather than " 'simply the specific intent to commit the underlying felony.' " (*Ibid*.)

The major participant requirement means a defendant's personal involvement must be "substantial" and greater than the actions of an ordinary aider and abettor to an ordinary felony murder. (*People v. Banks* (2015) 61 Cal.4th 788, 798, 802 (*Banks*).) The ultimate question "is 'whether the defendant's participation "in criminal activities known to carry a grave risk of death" [citation] was sufficiently significant to be considered "major." ' " (*Clark, supra,* 63 Cal.4th at p. 611.)

Our Supreme Court identified the following list of nonexclusive factors to consider when analyzing whether a defendant acted as a major participant: (1) " 'What role did the defendant have in planning the criminal enterprise that led to one or more deaths?' "; (2) " 'What role did the defendant have in supplying or using lethal weapons?' "; (3) " 'What awareness did the defendant have of particular dangers posed by the nature of the crime, weapons used, or past experience or conduct of the other participants?' "; (4) " 'Was the defendant present at the scene of the killing, in a position to facilitate or prevent the actual murder, and did his or her own actions or inaction play a particular role in the death?' "; and (5) " 'What did the defendant do after lethal force was

used?' " (*Clark, supra*, 63 Cal.4th at p. 611, quoting *Banks, supra*, 61 Cal.4th at p. 803.) It is not necessary that each factor be present, but the presence of no single factor is dispositive. Instead, "[a]ll may be weighed in determining the ultimate question, whether the defendant's participation 'in criminal activities known to carry a grave risk of death' [citation] was sufficiently significant to be considered 'major.' " (*Banks*, at p. 803.)

As for the mens rea requirement of reckless indifference to human life, our Supreme Court has explained that a defendant must be " ' "*subjectively* aware that his or her participation in the felony involved a grave risk of death." ' " (*Banks, supra*, 61 Cal.4th at p. 807.) The question is "whether a defendant has ' "knowingly engag[ed] in criminal activities known to carry a grave risk of death." ' [Citations.] The defendant must be aware of and willingly involved in the violent manner in which the particular offense is committed, demonstrating reckless indifference to the significant risk of death his or her actions create." (*Id*. at p. 801.) This requires more than the foreseeable risk of death inherent in any armed crime. (*Id*. at p. 808; see also *Clark, supra*, 63 Cal.4th at pp. 617-618 [participation in an armed robbery, alone, does not demonstrate reckless indifference to human life].) Instead, the defendant must consciously disregard a substantial and unjustifiable risk to human life. (*Clark*, at p. 617.) In addition to a subjective component, the recklessness indifference element also encompasses an objective component; a reviewing court asks whether the defendant's behavior was a " 'gross deviation' " from what a law-abiding person would have done under the circumstances. (*Ibid*.) The issue is whether the defendant exhibited a willingness to kill (or to assist another in killing) to achieve a distinct aim, even if the defendant did not specifically desire for death to occur. (*Ibid*.)

Recognizing the overlap between the major participant and reckless indifference elements (*Clark, supra*, 63 Cal.4th at pp. 614-615), our Supreme Court has considered the following list of nonexclusive factors in determining whether a defendant acted with reckless indifference to human life: (1) a defendant's knowledge of weapons, and use

11

and number of weapons; (2) a defendant's physical presence at the crime and opportunities to restrain the crime and/or aid the victim; (3) the duration of the felony; (4) a defendant's knowledge of the cohort's likelihood of killing; and (5) a defendant's efforts to minimize the risks of the violence during the felony (*id*. at pp. 618-623). Like the factors for the major participant element, no one factor is required or dispositive. (*Id*. at p. 618.)

Applying the foregoing factors, the *Clark* court vacated robbery-murder and burglary-murder special-circumstance findings despite finding that Clark was "the mastermind who planned and organized the attempted robbery and who was orchestrating the events at the scene of the crime." (*Clark, supra*, 63 Cal.4th at pp. 612, 623.) There, Clark and two relatives conducted surveillance of a computer store at closing time. Clark also secured use of a U-Haul truck. (*Id*. at pp. 536, 612.) The plan was for the first man to enter the store around closing time with an unloaded gun and handcuff the remaining employees in the restroom so no one could call the police. (*Id*. at p. 613.) Then, while Clark sat in the parking lot in a car, others were to help the first man remove computers from the store and load them into the U-Haul. However, before any computers could be removed, the mother of one of the handcuffed employees came into the store. The first man shot her in the head and fled to Clark's car. Clark drove away, leaving the shooter to be apprehended in the parking lot by an officer who overheard the gunshot. The gun used for the murder had been loaded with one bullet. (*Id*. at pp. 536-538, 613.)

Beginning with the major participant factors, the *Clark* court stated: "[W]e can conclude that defendant had a prominent, if not the most prominent, role in planning the criminal enterprise that led to the death of [the victim]. No evidence was presented about defendant's role in supplying the weapon, although inferences can be drawn from [the evidence] that use of a weapon was part of his plan for the robbery. No evidence was presented about defendant's awareness of the particular dangers posed by the crime, beyond his concern to schedule the robbery after the store's closing time. No evidence

12

was presented about his awareness of the past experience or conduct of . . . the shooter. Defendant was in the area during the robbery, orchestrating the second wave of the burglary after [the shooter] secured the store, but defendant was not in the immediate area where [the shooter] shot [the victim]." (*Clark, supra*, 63 Cal.4th at pp. 613-614.) The court then noted it previously upheld a major participant finding where "the defendant, although not present at the murder, was 'the founder, ringleader and mastermind behind' a criminal gang engaged in carjacking," and gave "his subordinate gang members . . . 'a carjacking tutorial and instructed them that a resisting victim was to be shot.' " (*Id.* at p. 614, quoting *People v. Williams* (2015) 61 Cal.4th 1244, 1281.) However, the court declined to decide whether Clark was a major participant, concluding only that "the evidence was insufficient to support that he exhibited reckless indifference to human life." (*Clark*, at p. 614.)

In reaching this conclusion, the court explained that the fact that Clark knew a gun would be used was insufficient under these specific facts to establish reckless indifference. The gun was not carried by the defendant and was loaded with only one bullet. (*Clark, supra*, 63 Cal.4th at pp. 618-619.) The court further explained that Clark was in his car in the parking lot when the victim was shot and was not provided with an opportunity to provide a restraining influence on his murderous cohort. (*Id.* at p. 619.) While the court acknowledged that the jury may have inferred Clark was aware the victim had been shot when he drove from the scene, indicating lack of regard for the victim's welfare, the court noted that Clark knew help was on the way in the form of police intervention. (*Id.* at p. 620.)

With respect to duration of the interaction between victims and perpetrators, the court noted the defendant planned the robbery for closing time, and the employees who remained would be handcuffed in the bathroom. Thus, "the period of interaction between perpetrators and victims was designed to be limited." (*Clark, supra*, 63 Cal.4th at p. 620.) At the same time, the court explained, "[b]ecause the robbery was planned for a

13

public space and involved the prolonged detention of employees, the crime did involve the risk of interlopers, such as [the murder victim]. But overall, the evidence was insufficient to show that the duration of the felony under these circumstances supported the conclusion that defendant exhibited reckless indifference to human life." (*Id*. at pp. 620-621.) There was no evidence the shooter was known to have a propensity for violence or Clark knew of such a propensity. (*Id*. at p. 621.)

Finally, the court considered the defendant's "apparent efforts to minimize the risks of violence" including planning the robbery for closing time and planning for use of an unloaded gun that ended up loaded with only one bullet (*Clark, supra*, 63 Cal.4th at pp. 621-622), and concluded: "Defendant's culpability for [the victim's] murder resides in his role as planner and organizer, or as the one who set the crime in motion, rather than in his actions on the ground in the immediate events leading up to her murder. But also relevant to his culpability as planner, there is evidence that defendant planned the crime with an eye to minimizing the possibilities for violence. Such a factor does not, in itself, necessarily preclude a finding of reckless indifference to human life. But here there appears to be nothing in the plan that one can point to that elevated the risk to human life beyond those risks inherent in any armed robbery. Given defendant's apparent efforts to minimize violence and the relative paucity of other evidence to support a finding of reckless indifference to human life, we conclude that insufficient evidence supports the robbery-murder and burglary-murder special-circumstance findings, and we therefore vacate them." (*Id*. at p. 623.)

C. *Analysis*

Here, the underlying felony for purposes of first degree felony-murder liability was the armed robbery of Vong. As relevant here, the People were required to prove: (1) defendant took property that was not his own; (2) the property was in the possession of another person; (3) the property was taken from the other person; (4) the property was taken against that person's will; (5) defendant used force or fear to take the property or

14

prevent the person from resisting; and (6) when defendant used force or fear, he intended to deprive the owner of the property permanently. Defendant's intent to take the property must have been formed before or during the time he used force or fear. (CALCRIM No. 1600.)

Applying the relevant factors identified by our Supreme Court, a rational jury could have reasonably concluded that defendant was a major participant in the robbery. There was evidence that defendant planned and initiated the sham purchase of a large amount of marijuana for the sole purpose of taking the marijuana without paying for it. While there was no evidence that defendant supplied Williams with the murder weapon, defendant joined with Williams after he met with Mims in the Raley's parking lot for the admitted purpose of "protection." Williams' value as a "protector" would be very limited were he not armed. Given that defendant had likely already planned to take the marijuana without paying for it at that point, a rational jury could infer that defendant brought Williams as an armed assistant to the robbery.

A rational jury could also find that defendant was aware of the particular dangers posed by his crime, for the reasons we have just described. Defendant contends that the murder only occurred because the car stalled, allowing Vong to get up and approach the car. But the car stalled only *after* defendant drove it away from the scene in the middle of the robbery with Vong still struggling inside, a very dangerous move for all involved. That the murder may not have occurred absent car trouble does not take away from defendant's awareness of the dangers posed by bringing a gunman to high-value robbery that defendant himself had orchestrated. A rational jury could have reasonably inferred that defendant came to the robbery prepared to eliminate any threat posed by the victim by employing deadly force through Williams. When he could not eliminate the threat by dragging the victim away in the car and forcing him out while driving, he had Williams to help eliminate the threat.

15

A rational jury could also find that defendant was in a position to facilitate or prevent Vong's murder. There is no dispute that defendant was the person who planned the robbery. Defendant called Mims several times, met with Mims before the transaction, withdrew money from an ATM, drove to Hall's house after picking up Williams, inspected the samples of the marijuana Vong had to sell, convinced Vong to bring the marijuana to his car alone, was driving the car when it left Hall's house with the marijuana and Vong still inside, and was still in control of the car at the time Vong was shot from inside. There was no evidence that Williams interacted with anyone other than defendant throughout the relevant time period, and there was no evidence that anyone other than defendant had *any* role in planning the robbery. A rational jury could reasonably infer that defendant, as the driver and main robber, had the authority to tell Williams not to shoot Vong and that Williams would not have done so without defendant's express or tacit authorization. Additionally, Vong was only shot after he had jumped or fallen out of the car, stood up, and gone back to the car. Accordingly, there was sufficient time for defendant to direct Williams' next actions.

After Williams shot Vong there was no evidence that defendant was surprised or dismayed by the shooting. He drove away from the scene, facilitating the shooter's escape, and moments after the murder took Mims' call only to express concern about whether witnesses might be "snitching" and hang up. Upon arriving home after the murder, defendant photographed the bags of marijuana and a bundle of money, which a rational jury could interpret as celebrating a successful robbery. Accordingly, there was sufficient evidence from which a rational jury could have found that defendant was a major participant in the robbery within the meaning of section 190.2, subdivision (d).

Turning to the reckless indifference element; as we have already explained, there was evidence supporting the finding that defendant planned to lure the seller of 10 pounds of marijuana into his car so he could take the marijuana by force while having an armed guard on standby in the event lethal force was needed. Defendant was physically

16

present throughout the robbery and murder, and a rational jury could reasonably find that defendant had the authority (as the planner and leader of the operation) and the opportunity (given the robbery's duration) to direct Williams either to shoot or to refrain from shooting Vong. While there was no evidence in the record about defendant's knowledge of Williams' history of violence or willingness to kill, as we have discussed, given the surrounding circumstances a rational jury could infer that defendant brought Williams along specifically for the purpose of using deadly force should the need arise.

*Clark* is readily distinguishable from the facts here. In *Clark*, Clark remained in a car in the parking lot away from the robbery scene during the crimes and was never in possession of the gun. Further, the gun was intended to be unloaded and the plan for the robbery included separating the victims from the goods to be stolen with a minimal use of force. (*Clark*, *supra*, 63 Cal.4th at p. 613.) We recognize that defendant did not wield the gun here, but he added the gunman to the equation in the admitted role of "protector" for a large amount of money. Further, there is no evidence defendant thought the gun was unloaded or otherwise sought to minimize force; he was the driver of a car that sped off with the victim struggling and still partially inside, employing potentially deadly force even before the victim was shot. Defendant's decision to bring along an armed guard demonstrates that he considered the use of deadly force reasonably foreseeable, unlike Clark. Additionally, defendant was in control of the car containing the shooter when the shooting occurred, giving rise to the inference that he could have stopped the murder from taking place. Indeed, he sped off with the shooter inside only moments after the deadly shots were fired. Moreover, the court in *Clark* observed that while Clark drove away from the scene, indicating a lack of regard for the victim's welfare, he knew help was on the way in the form of police intervention. (*Id*. at p. 620.) Conversely, here, defendant drove away from the scene without such knowledge. Rather, in a phone call with Mims moments after the murder, defendant demanded to know if witnesses were "snitching." Thus, defendant expressed no concern about Vong's welfare, only about his

17

own chances of getting away with the crime. Finally, unlike in *Clark*, here defendant facilitated the shooter's getaway.

We recognize that the duration of the interaction between the perpetrators and victims in this case was fairly brief, but whereas Clark planned for limited interaction between the robbers and a limited number of segregated victims, here the robbery was designed to isolate Vong from the other men at Hall's house, utilize the maximum amount of force necessary to separate Vong from the marijuana and neutralize any threat he posed, and flee the scene. While defendant's plan did not necessarily require the use of deadly force, his plan did anticipate resistance and the responsive use of force. Sufficient evidence supports the finding that defendant acted with reckless indifference within the meaning of section 190.2, subdivision (d).

II

*New Trial Motion*

Defendant contends that he is entitled to relief under *Brady* because the prosecution inadvertently failed to disclose an interview between Stockton police detectives and Watkins (who originally connected Mims with defendant for the marijuana transaction) at the Alameda County jail, and Watkins' phone records. We conclude defendant has not proven a *Brady* violation, as the nondiscovery of the evidence at issue here does not undermine confidence in the trial's result.

A. *Procedural History*

Following his conviction, defendant filed a motion for a new trial claiming in part that the prosecution never turned over a taped January 2014 jailhouse interview of Watkins by Detectives Brian Fry and Moreno or copies of Watkins' phone records, in violation of *Brady*.

Defendant submitted copies of the interview and phone records, including Watkins' text messages following the murder, as exhibits. In the interview, Watkins stated that Mims contacted him (rather than he contacted Mims, which was Mims'

18

testimony) because Mims had marijuana for sale, and Mims wanted to know if he knew of a buyer.  Later, two men named Kenneth and Josh asked Watkins if he knew of a marijuana seller, so he gave Mims their phone number.  Following the robbery, Mims called Watkins and told him that " 'they robbed him.' "  Watkins recounted that Mims said he " 'followed the dude to the bank to get the money and when we came back,' . . . 'I guess the dude down the court something, whatever happened, and they said he heard a shot and he drove off.' "  Mims called Watkins and Kenneth--to whom he referred as "K because his name is Kenneth"--on a three-way call, and Watkins asked Kenneth what happened, but Kenneth hung up the phone.  Kenneth changed his phone number soon after, and Watkins had not contacted him since.  Watkins did not remember the area code of Kenneth's phone number.

Watkins estimated Kenneth was approximately five feet nine inches tall and 180 to 190 pounds.  Watkins stated that Kenneth "wasn't like skinny or anything," and had broad shoulders, and both Kenneth and Josh had dreadlocks.  Watkins recalled that Kenneth drove a green four-door Chevrolet Impala with a tail fin or spoiler on the back and tinted back windows.

Detective Moreno challenged Watkins' description of Kenneth as different from the other descriptions of the driver.  Watkins said he was just providing the detectives with a description of what he knew.  He later added:  "I'm just giving you a description of the person that I know as K.  That's all I can -- that's all I can say.  I wouldn't change that story for nothing."  Watkins was shown a lineup that included defendant, but he did not identify anyone as Kenneth.

Detective Fry described the interview in a report that was provided to the defense before trial:  "On [January 21, 2013], Det[ective] Moreno and I met with James Watkins at the Alameda County Jail.  Watkins played a role in the planning of the Marijuana transaction.  We showed him the same but new photo line up containing a photo of

19

[defendant] that we showed [Mims]. Watkins studied the photo for a brief period of time then stated he did not recognize anyone in the line up."

According to the records extracted from Watkins' phone, at 10:54 p.m. on the date of the murder, Watkins texted an unknown number: "Man jimmy just set walter up . . . its going dwn . . long story."[6] On December 26, Watkins sent a text message to a different unknown number that said: "U ignoring me jimmy." Watkins' phone records reflect that Mims called Watkins multiple times on the date of the murder between 7:27 and 9:25 p.m.

The prosecution opposed defendant's motion for new trial and filed a declaration of Deputy District Attorney Danielle Peirano, who tried the case. Peirano declared that she took over the case in June 2017 from Zoette Dobbert. Defendant retained Cooper Law Offices to represent him, but Allan Jose substituted in as retained counsel for defendant in April 2016. Peirano declared that she and Jose met for a discovery conference in late June 2017, at which time Jose provided her with a CD containing an audio recording of the Watkins interview. Peirano copied the CD and returned it to Jose. During that discovery conference, the attorneys ensured that they each had the same discovery. Jose subsequently requested discovery, to which the prosecution responded. Jose did not specifically request the Watkins interview or phone records related to Watkins, Samuels, Mims, Groomes, or Vong. Before trial, Peirano provided Jose with a list of all items of evidence in the case to ensure that Jose was in possession of all of the evidence. One of the items listed was the Watkins interview CD.

The trial court held an evidentiary hearing on defendant's motion. Roger Flores, defendant's new attorney, called Detective Moreno, Sergeant Fry (formerly Detective Fry), and Jose to testify. Detective Moreno testified that she gave a copy of the Watkins

---

[6] Watkins referred to Mims by his first name Walter throughout his interview.

20

interview to Dobbert, the original prosecutor. Moreno did not give a duplicate copy to Peirano when she took over the case. Moreno also gave Dobbert phone records that she had subpoenaed for several individuals, including Watkins, and data from Mims' and Hall's physical phones. At some point before trial Peirano requested the Watkins interview, but Moreno told her that she had already given it to Dobbert and that " '[she] should already have it.' "

Jose testified that Cooper Law Offices provided him with a box of discovery when he took over the case. The discovery included CD's and a list identifying what was on the CD's, including interviews and phone records; the list did not name Watkins. Jose did not cross-reference what was on the list with what he actually received. An evidence sheet from July 2017 listed several items of evidence that the prosecutor provided to Jose, but it did not list Watkins' phone records or the recorded interview of Watkins. An envelope to Jose from the prosecutor from August 2017 stated it was a DVD of the crime scene. Jose acknowledged that he received additional discovery directly from both prosecutors, but he could not recall specifically what items he received. He did not recall receiving any other CD's or DVD's. He did not recall receiving the Watkins interview, and he did not recall hearing the interview, although he did recall reading a short summary of the interview in a police report. He disagreed that it was possible he had the Watkins interview and misplaced it. He stated: "I know for a fact I did not have the Watkins interview. I didn't have it, otherwise I would have relied upon it or questioned the detective on it when we went to trial." He stated that if he did have it, he was not aware of it because he never reviewed it. If he had known Watkins said he directed two men named "Kenneth" and "Josh" to contact Mims regarding them wanting to buy marijuana, it would have influenced his trial strategy.

Jose's investigator attempted unsuccessfully to locate Watkins. The investigator stated that he would have used the phone numbers and addresses Watkins provided to the detectives had he possessed them.

21

On cross-examination, Jose testified that he worked with several assistants and an investigator. His practice was to give original records or CD's to the assistants, and they provided the CD's to the investigator, depending on what needed to be done, for follow-up. He gave his assistant DVD's or CD's in this case to give to his investigator, but he did not keep a log of what items he handed out, or whether they were returned. He acknowledged: "I expect them to bring it back. They are very good in bringing it back. But as you can imagine, sometimes things slip through the crack." When asked whether he was sure his assistants and investigator brought all of the CD's and DVD's back in this case, he admitted that he had "no idea." Jose agreed it was possible he received discovery from the prosecutor that was not included in the official ledger.

Jose also agreed that he and Peirano met to compare discovery in June 2017. Jose did not recall giving Peirano a specific CD, but he did remember Peirano copying some disks or paper and returning them to him. He asserted, however, that if the Watkins interview was included in those items, he was not aware of it. Jose made informal discovery requests following the meeting, but he never requested any interview or phone records of Watkins.

Jose also acknowledged he met with Peirano before and during trial to go over exhibits, and he would have requested any document he did not already have, but he was not aware that the Watkins interview was contained in those exhibits. He asserted that he did not go through the list of exhibits looking for things he was missing.

The trial court denied defendant's new trial motion with respect to his *Brady* claim. It ruled: "With regard to the claimed [*Brady*] violations, the Court has heard and considers all of the steps taken by both counsel in the exchange of the materials and information each had received from their predecessors in this case, and this was ongoing it appears. It was thorough. It was transparent. And the Court finds in no manner that the People engaged in suppression or in the withholding of exculpatory evidence or any evidence for that matter which had been gathered in this -- in the investigation of this

22

matter.  On that basis, the claimed [*Brady*] violation, the motion for new trial must be denied."

B.  *Legal Background*

Although section 1181 provides the statutory grounds for a new trial motion, our Supreme Court has held that a new trial may be granted for the prosecution's failure to disclose material information that is favorable to the accused under *Brady*.  (*People v. Hoyos* (2007) 41 Cal.4th 872, 917 [alleged *Brady* violation].)  On appeal, a trial court's ruling on a motion for new trial based on an alleged *Brady* violation is reviewed under an abuse of discretion standard.  (*Ibid.*, fn. 27.)  In that circumstance, "the asserted abuse of discretion is the asserted failure of the trial court to recognize violations of defendant's constitutional rights."  (*Ibid.*)  " ' "The determination of a motion for a new trial rests so completely within the court's discretion that its action will not be disturbed unless a manifest and unmistakable abuse of discretion clearly appears." ' "  (*People v. Davis* (1995) 10 Cal.4th 463, 523-524.)  An abuse of discretion occurs when a ruling "rests on an error of law."  (*People v. Cannedy* (2009) 176 Cal.App.4th 1474, 1483.)  We will review independently conclusions of law or mixed questions of fact and law involved in the trial court's determination of the *Brady* elements.  (*People v. Salazar* (2005) 35 Cal.4th 1031, 1043.)

*Brady* and its progeny generally obligate the prosecution to disclose to the defense information that is " 'favorable to the accused' and is 'material' on the issue of either guilt or punishment."  (*City of Los Angeles v. Superior Court* (2002) 29 Cal.4th 1, 7.)  The state has a duty to disclose such evidence even where there has been no request by the accused.  (*United States v. Agurs* (1976) 427 U.S. 97, 107; *People v. Salazar*, *supra*, 35 Cal.4th at p. 1042.)  " 'For *Brady* purposes, evidence is favorable if it helps the defense or hurts the prosecution, as by impeaching a prosecution witness.'  [Citation.] '[The] touchstone of materiality is a "reasonable probability" of a different result . . . . The question is not whether the defendant would more likely than not have received a

23

different verdict with the evidence, but whether in its absence he received a fair trial, understood as a trial resulting in a verdict worthy of confidence.  A "reasonable probability" of a different result is accordingly shown when the government's evidentiary suppression "undermines confidence in the outcome of the trial." '  [Citation.]  In determining whether evidence is material under this standard, we consider ' "the effect of the nondisclosure on defense investigations and trial strategies." ' " (*People v. Williams* (2013) 58 Cal.4th 197, 256.)  Such a reasonable probability is "assessed by considering the evidence in question under the totality of the relevant circumstances and not in isolation or in the abstract.  [Citation.]  Further, it is a probability that is, as it were, 'objective,' based on an 'assumption that the decisionmaker is reasonably, conscientiously, and impartially applying the standards that govern the decision,' and not dependent on the 'idiosyncra[s]ies of the particular decisionmaker,' including the 'possibility of arbitrariness, whimsy, caprice, "nullification," and the like.' " (*In re Sassounian* (1995) 9 Cal.4th 535, 544.)  Materiality does not entail a substantial evidence analysis, and defendant does not have to demonstrate a reasonable probability of a different verdict had the suppressed evidence been disclosed to the defense.  (*Kyles v. Whitley* (1995) 514 U.S. 419, 434-435; *Williams*, at p. 256.)  If constitutional error is evident, "there is no need for further harmless-error review.  [Citation.]  The one subsumes the other." (*People v. Stewart* (2020) 55 Cal.App.5th 755, 778.)

  C. *Failure to Disclose*

  The first issue is whether defendant has demonstrated that the prosecution failed to disclose the Watkins interview.  The Attorney General contends that the prosecution turned over "all available requested evidence" to the defense, and he points to the trial court's conclusion that the prosecution did not engage in suppression or withholding of any evidence.  However, whether the prosecution actively suppressed or withheld evidence, or turned over all available *requested* evidence, is irrelevant to the issue before us.  Rather, we must decide whether defendant has demonstrated that the Watkins

24

interview and phone records were not disclosed to the defense. (See *People v. Stewart*, *supra*, 55 Cal.App.5th at p. 769 [inadvertent suppression of material evidence sufficient to establish *Brady* violation].)

As we have noted, Peirano declared that she received the Watkins interview--but not Watkins' phone records--from defense counsel Jose at a discovery conference. But aside from Peirano's declaration, there is no support for that assertion. Detective Moreno testified that she gave the interview to Dobbert. At some point before trial, Peirano requested the Watkins interview from Moreno, but Moreno told her that she had already given it to Dobbert. Moreno's testimony demonstrates that the Watkins interview was in Peirano's file prior to the discovery conference with Jose--whether Peirano had seen it is another matter--which calls into question Peirano's assertion that she originally received the interview from Jose. Additionally, while the precise timing of Peirano's request to Moreno for the interview--sometime before trial--was not clear, Moreno's testimony suggests that at the time Peirano made the request, she had not received the interview from Jose at the discovery conference.

Jose's testimony at the evidentiary hearing on defendant's new trial motion also supports the conclusion that the Watkins interview and phone records were never disclosed to the defense. Jose testified that he never saw the interview, which is supported by the fact that he did not question Moreno about the details of the interview during trial, and Jose's investigator was unable to locate Watkins, despite the fact that Watkins provided detectives with two phone numbers and an address during the interview. Additionally, there is no documentation supporting the assertion that Cooper Law Offices had received the interview from the prosecution or provided it to Jose. Indeed, aside from Peirano's declaration that she received the interview from Jose, there is no evidence that Jose ever was given the interview and there is no evidence whatsoever that the defense received Watkins' phone records. Defendant has shown nondisclosure.

25

D. *Favorability and Materiality*

As we have discussed, suppression of evidence alone--whether willful or inadvertent--does not require reversal unless the evidence is *both* favorable to the defense *and* material such that the nondisclosure undermines confidence in the trial's outcome. Recognizing that this case hinged on the identity of the driver of the car, defendant contends the Watkins interview and text messages were favorable and material because Watkins named other individuals as the robbers, Watkins did not identify defendant in a lineup, and Watkins described Kenneth's car as a green Chevrolet Impala with a tail fin or spoiler, consistently with Mims' testimony at trial and inconsistently with defendant's car, which had no similar feature. He also asserts that Watkins' statement contradicted Mims' testimony that Watkins called him about a buyer; Watkins told detectives that Mims called Watkins because he knew a seller and wanted to know if Watkins knew a buyer. Generally, defendant contends that the jury may have entertained doubt that defendant was indeed the driver had Watkins testified at trial.

In addition to his arguments regarding the probative value of Watkins' statements and text messages, defendant observes that his investigator attempted unsuccessfully to locate Watkins, and he contends that his investigator would have been able to locate Watkins and pursue this "critical lead" had the interview been disclosed.

As we will explain, we conclude that consideration of the Watkins interview and text messages was not reasonably probable to lead to a different result at trial such that the suppression of the evidence undermined confidence in the trial's outcome.

At the outset, it is undisputed that Watkins pointed to other individuals as the robbers in his interview and text messages. During his interview, Watkins stated that he put "Kenneth and Josh" in touch with Mims for purposes of buying marijuana, and after the robbery, Mims and Watkins spoke with "Kenneth" on the phone in an effort to learn what had happened. If Watkins testified inconsistently with those statements at trial, the prosecution would have been able to impeach that testimony with his statements.

26

Additionally, in a text message, Watkins stated that "Jimmy" had set up Mims, suggesting another possible suspect. However, numerous factors diminished any probative value of Watkins' statements and text messages.

As the detectives recognized during his interview, Watkins' description of Kenneth and Josh did not match any of the descriptions of the driver offered at trial. Watkins described Kenneth as approximately five feet nine inches tall, weighing 180 to 190 pounds, with broad shoulders and dreadlocks. Conversely, Mims testified that the driver was "kind of fat" or "heavyset" and did not have any hair. A few hours after the murder, Groomes told officers, " 'If I could see that fat bastard right now, I would know who he is,' " and he testified that the driver was "big." Groomes identified Samuels in a lineup, but he testified that he did so because Samuels was "fat" and based on his "body structure" because he did not see the driver's face. Hall could only recall that the driver "wasn't a small person, I know that," and that the driver "took kind of more of the seat" and "took up more of everything."

At trial, defendant argued that Samuels, along with Mims and Hall, had set up the robbery and that Samuels was the driver of the car. In closing, defense counsel argued that Groomes had identified Samuels as the driver of the car, that Samuels looked "almost identical" to defendant, that Samuels was Mims' close friend, and that Samuels drove a car very similar to defendant's Acura. Indeed, Mims agreed that Samuels' appearance was somewhat similar to that of defendant, and he testified that Samuels was approximately five feet six inches tall, weighed approximately 250 pounds, and was a dark-skinned African-American man. Detective Moreno agreed that Samuels fit the description individual witnesses gave at the scene of a dark-skinned, heavyset African-American man. Thus, were defendant to pursue the argument that Kenneth was the driver of the car, he would be required to impeach the testimony of Hall and Groomes regarding their description of the driver, as well as Mims' identification of defendant as the driver.

27

In addition to providing a description of Kenneth that was contradicted by all of the available evidence at trial and conflicted with defendant's strategy to blame Samuels, Watkins was unable to provide additional details regarding Kenneth's identity. Watkins did not provide Kenneth's last name, and he did not know Kenneth's contact information, address, or any way to contact him through associates. Watkins suggested that he barely knew Kenneth aside from seeing him around the neighborhood. For all intents and purposes, Watkins provided detectives with a dead end. Indeed, Watkins provided little to support the finding that Kenneth and Josh actually existed. Moreover, Watkins' statements were inconsistent with his text messages, in which he stated that "jimmy just set Walter up." Watkins did not tell the detectives that a man named Jimmy was involved in the robbery. Accordingly, the version of events that Watkins provided to detectives during the interview was further lacking in credibility given the internal inconsistencies in his own statements.

Further, Watkins' interview statements corroborated several important details of the prosecution's case. Watkins stated that he and Mims acted as middlemen for the marijuana transaction, and that Mims said he followed the driver to the bank to withdraw funds for the transaction. That statement corroborated Mims' testimony regarding going to Raley's with defendant so defendant could withdraw money from the ATM, which was further corroborated by footage from Raley's surveillance cameras showing Mims and defendant entering the Raley's seconds apart and approximately two and a half hours before the murder. Watkins also confirmed that Mims called Watkins after the robbery, that Mims spoke with the driver after the robbery to ask him what happened, and that Kenneth changed his phone number soon after the robbery. These details corroborated Mims' testimony about the happenings surrounding the murder.

Watkins' statement also corroborated Mims' assertion that he did not know the robbers before the robbery. The defense theory at trial was that Mims planned the robbery with Samuels, his known associate. But Watkins stated in his interview that he

28

referred Kenneth and Josh to Mims and provided Mims with their phone number; Watkins did not state or imply that Mims knew Kenneth and Josh before the date of the robbery.

We acknowledge that it is *possible* the defense would have changed strategies had the Watkins interview and phone records been disclosed. (See *People v. Williams*, *supra*, 58 Cal.4th at p. 256 [when considering whether evidence is material, we consider the effect of nondisclosure on defense investigations and trial strategies].) At the hearing on defendant's motion for new trial, Jose testified that the Watkins interview would have affected his trial strategy, and defendant contends on appeal that he could have used Watkins' identification of Kenneth and Josh to assert that someone other than he drove the car. Defendant also recognizes that Samuels' cell phone records showed the phone was located in Oakland throughout the month of December 2013, implying that the Samuels theory was not persuasive.

However, as we have discussed, the theory that Kenneth and Josh committed the robbery was not reasonably probable to lead to a different result at trial. Rather than having a suspect--Samuels--who had a body type matching descriptions given at trial, a close connection to Mims, and who was known to drive a car similar to the one used in the robbery, the defense would have been forced to rely entirely on Watkins' credibility about these two unknown men whose descriptions were substantially different from the descriptions provided by witnesses, with no evidence corroborating Watkins' statement that these men existed. Additionally, because there is no evidence to suggest that Mims knew these men before the robbery, there would have been no reason for Mims to protect the men by giving a description different than what he had observed or by identifying defendant in a lineup and at trial. Similarly, the theory that Kenneth and Josh committed the crime would have lacked Groomes' identification of Samuels, the defense suspect, in a lineup.

We recognize that Watkins described Kenneth's car consistently with how Mims' described the car used in the robbery, including that the car had a tail fin or spoiler, which was not present on defendant's car. However, that car also matched the description of Samuels' car. Moreover, as we have discussed, that detail falls well short of compensating for the many shortcomings in Watkins' statements.

Defendant contends that, had the Watkins interview been disclosed, he would have argued that Watkins did not pick defendant out of a lineup when given the chance to do so. However, the report prepared by Detective Fry regarding the interview with Watkins and given to defense had already disclosed that fact. Therefore, that avenue of inquiry was already available to defendant at trial.

Finally, defendant contends that had the Watkins interview been disclosed, he would have been able to contact Watkins and pursue an important lead. But as we have discussed, the information contained in Watkins' statement was unlikely to assist the defense. It is also entirely speculative to suggest that contacting and interviewing Watkins would have provided any additional information regarding Kenneth and Josh. Watkins told detectives that Kenneth changed his phone number immediately after the robbery, and he had no way to contact Kenneth. He did not know Kenneth's last name or where he lived. Watkins asserted that he told detectives everything he knew about the robbery. There is nothing to suggest that Watkins had anything more to say about the robbery than he told detectives. Further, if he added to or changed his testimony by elaborating on what he had told the detectives, his testimony would have been subject to impeachment.

"A criminal defendant has a right to present evidence of third party culpability if it is capable of raising a reasonable doubt about his own guilt." (*People v. Sandoval* (1992) 4 Cal.4th 155, 176; accord, *People v. Hall* (1986) 41 Cal.3d 826, 833.) Watkins' statement to detectives introduced two new first names and a different physical description of the buyer to the happenings surrounding the crime. But the statements'

30

internal inconsistencies, inconsistencies with other testimony at trial, lack of detail, and tendency to corroborate Mims' testimony vastly outweigh the probative value of the assertion that Kenneth and Josh committed the robbery. The evidence at issue was material, but not favorable to defendant such that there is any reasonable probability that disclosure of the Watkins interview or phone records would have led to a different result at trial. We conclude defendant has failed to establish *Brady* error.

## III

### *Admission of Defendant's Nickname*

Defendant contends that the trial court prejudicially abused its discretion by admitting, over his objection, evidence that his moniker was "Killa Kal." We disagree.

A. *Procedural Background*

The prosecutor moved in limine to admit evidence of text messages from the HTC phone in which defendant identified himself as "Killa Kal." The prosecutor argued this nickname was relevant because it linked defendant to the HTC phone, which, as we have previously discussed, was used during the crimes. The prosecutor added that defendant laughed when detectives told him that they had called officers at the Oakland Police Department, who knew him as "killer Kalom" or "Killer Kal"; the prosecutor asserted that his laughter was his acknowledgment that that was indeed his nickname. Defense counsel objected. He noted this was a murder trial, and identifying defendant as a "Killa" would be inflammatory. Counsel further argued there were other text messages identifying the author as "Kalom," so the reference to "Killa" was not necessary to link the phone to defendant. The court overruled the objection, concluding: "With the proper foundation to be laid of course, the Court finds the use of the moniker, if defendant is self-identifying in this fashion, to be highly relevant."

At trial, the prosecution elicited testimony that defendant's phone contained text messages in which defendant referred to himself as "killa K" and "Killa." A defense witness acknowledged that defendant's moniker was indeed "Killa K," but the nickname

31

was given to him when he was younger due to his skills as a rapper. The prosecution referred to defendant's moniker during closing only to reiterate that the moniker was used to identify defendant as the owner of the phone. Defense counsel reiterated to the jury that defendant's nickname was solely related to his skills as a rapper.

B. *Legal Background*

Evidence is admissible only if it is relevant. (Evid. Code, § 350.) Relevant evidence is defined as evidence "having any tendency in reason to prove or disprove any disputed fact that is of consequence to the determination of the action." (*Id.*, § 210.) The general test of relevance " 'is whether the evidence tends "logically, naturally, and by reasonable inference" to establish material facts such as identity, intent, or motive.' " (*People v. Bivert* (2011) 52 Cal.4th 96, 116-117.) All relevant evidence is admissible except as otherwise provided by a statutory or constitutional exclusionary rule. (See Cal. Const., art. I, § 28, subd. (f)(2); Evid. Code, § 351.)

A court may exclude evidence "if its probative value is substantially outweighed by the probability that its admission will (a) necessitate undue consumption of time or (b) create substantial danger of undue prejudice, of confusing the issues, or of misleading the jury." (Evid. Code, § 352.) A trial court has broad discretion in determining whether evidence is relevant and whether Evidence Code section 352 precludes its admission. (*People v. Mills* (2010) 48 Cal.4th 158, 195; *People v. Williams* (2008) 43 Cal.4th 584, 634.)

We review a trial court's rulings on the admissibility of evidence for abuse of discretion. (*People v. Benavides* (2005) 35 Cal.4th 69, 90.) "The prejudice which exclusion of evidence under Evidence Code section 352 is designed to avoid is not the prejudice or damage to a defense that naturally flows from relevant, highly probative evidence. '[A]ll evidence which tends to prove guilt is prejudicial or damaging to the defendant's case. The stronger the evidence, the more it is "prejudicial." The "prejudice" referred to in Evidence Code section 352 applies to evidence which uniquely

tends to evoke an emotional bias against the defendant as an individual and which has very little effect on the issues. In applying section 352, "prejudicial" is not synonymous with "damaging." ' " (*People v. Karis* (1988) 46 Cal.3d 612, 638; see *People v. Holford* (2012) 203 Cal.App.4th 155, 167.) "Evidence is not inadmissible under section 352 unless the probative value is 'substantially' outweighed by the probability of a 'substantial danger' of undue prejudice or other statutory counterweights." (*Holford*, at p. 167.) A " 'trial judge need not expressly weigh prejudice against probative value—or even expressly state that he has done so.' " (*People v. Brooks* (2017) 3 Cal.5th 1, 40.)

C. *Analysis*

Defendant contends that the trial court abused its discretion when it admitted evidence of his nickname. He contends that the evidence of his nickname was only admitted to prove the HTC phone belonged to him, but there was ample other evidence linking the phone to him, rendering the evidence cumulative and therefore minimally probative. He further argues that the nickname "Killa" was inherently prejudicial, and because the evidence was minimally probative, the court abused its discretion by not excluding the evidence as unduly prejudicial under Evidence Code section 352.

Defendant's moniker was relevant because it tended to establish his ownership of the phone. (See *People v. Williams*, *supra*, 43 Cal.4th at p. 633 [evidence is relevant if it " ' "logically, naturally, and by reasonable inference" ' " establishes a material fact]; Evid. Code, § 210.) Defendant's nickname was Killa, and the owner of the phone referred to himself as "killa K" and "Killa" in text messages. We recognize that there was other evidence in the phone tending to establish defendant's ownership of the phone, including other text messages identifying the author as "Kalom," photos of the Lexus defendant was driving at the time of his arrest, a photo of defendant wearing the necklace he was wearing on the Raley's surveillance footage, and a text message referring to a type of credit card defendant possessed at the time of his arrest. However, the evidence was not irrelevant simply because there was other evidence on the phone tending to prove

defendant's ownership of it.  Evidence may be relevant even though it is cumulative.  (*In re Romeo C.* (1995) 33 Cal.App.4th 1838, 1843.)

Defendant further contends that the issue of his ownership of the phone was not disputed, and therefore the evidence of his nickname cannot have been relevant.  But when defendant moved for judgment of acquittal under section 1118.1, counsel asserted that the only "truly independent" evidence linking defendant to the scene is the phone records.  Counsel argued, "[t]here is nothing that links that phone number to my client independently."  Counsel further argued that, when defendant was arrested with the HTC phone, the phone number had a 415 area code, and the pictures on the phone connecting defendant to the phone were all taken after Vong's murder.  Counsel's argument demonstrates that the question of the ownership of the HTC phone was indeed disputed at trial.

Thus, the question before us is not whether the evidence was relevant, but rather whether the evidence of defendant's moniker was unduly prejudicial.  (See Evid. Code, § 352; *In re Romeo C.*, *supra*, 33 Cal.App.4th at p. 1843 ["the only ban on cumulative evidence is found in [Evid. Code, § 352]"]; *People v. Cardenas* (1982) 31 Cal.3d 897, 905 ["[The] prosecution has no right to present cumulative evidence which creates a substantial danger of undue prejudice to the defendant"].)

To support his argument that the trial court abused its discretion by admitting the evidence, defendant relies on *People v. Cardenas*, *supra*, 31 Cal.3d 897, and *People v. Maestas* (1993) 20 Cal.App.4th 1482.  In *Cardenas*, the prosecution challenged the credibility of an alibi witness by introducing evidence that the witness and the defendant were members of the same gang, where there was already evidence that the witness and the defendant lived in the same neighborhood, had the same circle of friends, and played basketball together.  (*Cardenas*, at p. 904.)  Our Supreme Court recognized that the additional evidence that the witness and the defendant were members of the same gang

34

was minimally probative, and there was substantial risk of unfair prejudice by introducing evidence that defendant was a member of a gang.  (*Id.* at pp. 904-905.)

Similarly, in *Maestas*, the prosecutor impeached a witness by eliciting testimony that the witness and the defendant were members of the same gang, where the prosecutor had already established that the witness and the defendant were close friends who spent a lot of time together.  The appellate court concluded the admission of the gang evidence was an abuse of discretion.  (*People v. Maestas*, *supra*, 20 Cal.App.4th at p. 1495.)

We conclude that, unlike the prejudicial effect of the evidence in *Cardenas* and *Maestas*, the prejudicial effect of the evidence of defendant's moniker was negligible.  First, the prosecution only discussed defendant's moniker with respect to identifying the owner of the phone.  There was no "gratuitous use of, or reference to, the nickname," and any uses of defendant's moniker "were brief, mild and factual and could not have been prejudicial."  (*People v. Brown* (2003) 31 Cal.4th 518, 551.)[7]  Accordingly, the facts here are unlike those in *Cardenas* and *Maestas*, in which the evidence was used to establish the defendants' membership in a gang.  Here, given the nature of the evidence of the nickname, which only sought to identify the owner of the phone, and the testimony elicited by defendant regarding the genesis of the moniker as solely related to his rapping skills, there is nothing to suggest that evidence of defendant's moniker would have had an unduly inflammatory effect on the jury.

Defendant responds that the prejudice flowing from a moniker identifying defendant as "Killa" is self-evident.  We recognize that some nicknames, those that clearly connote violence, may be inherently prejudicial.  (See *People v. Lee* (2011)

_____

[7]  Defendant's reliance on *People v. Leonard* (2007) 40 Cal.4th 1370 is misplaced.  There, in the context of an appeal from the trial court's denial of the defendant's motion to change venue, our Supreme Court considered whether sensational media coverage of the trial--including ascribing to the defendant the name "Thrill Killer"--militated in favor of changing venue.  (*Id.* at p. 1395.)  *Leonard* has no bearing on the issue before us.

51 Cal.4th 620 [nickname "Point Blank"]; *U.S. v. Farmer* (2d. Cir. 2009) 583 F.3d 131 [nickname "Murder"]; but see *People v. Brown*, *supra*, 31 Cal.4th at p. 551, fn. 12 [defendant's nickname, "Bam Bam" or "Bam," was "not particularly inflammatory"; evidence demonstrated nickname was a childhood nickname related to cartoon character].)  As we have discussed, the evidence of defendant's moniker showed that it was derived from his rapping ability, not any history of violence.  Thus, we do not agree with defendant that, in this case, the prejudice flowing from evidence of his moniker was self-evident.  The trial court did not abuse its discretion by admitting evidence of defendant's nickname.

IV

*Unauthorized Sentence*

Our review of the record has revealed an unauthorized sentence.  At sentencing, the trial court stated that sentence is suspended pursuant to section 654 regarding the robbery (count 2), and it did not impose any sentence for that offense.  Once the trial court has denied probation, it has no power to "suspend" a sentence.  (*People v. Superior Court (Roam)* (1999) 69 Cal.App.4th 1220, 1230.)  "If the court does suspend the imposition of sentence, the defendant is under an informal grant of probation."  (*Ibid.*)  As the court denied probation in this case, a suspended sentence on the robbery count was unauthorized.

It is possible that the trial court simply misspoke and intended to *stay*, rather than *suspend*, the sentence pursuant to section 654.  However, staying imposition of sentence is also an improper implementation of section 654 and results in unauthorized sentences.  (*People v. Alford* (2010) 180 Cal.App.4th 1463, 1468-1469, 1472.)  "A trial court must impose sentence on every count but stay execution as necessary to implement section 654."  (*Id.* at p. 1472.)

In the interests of judicial economy, we exercise our authority to modify the judgment (§ 1260) rather than remanding for resentencing. (*People v. Alford*, *supra*, 180 Cal.App.4th at p. 1473.) We impose a midterm sentence on count 2 of three years (§§ 211, 213, subd. (b)) plus a one-year sentence on the firearm enhancement (§ 12022, subd. (a)). We stay execution of these sentences under section 654.

## DISPOSITION

The judgment is modified to impose and stay defendant's sentence (§ 654) on count 2 as set forth in this opinion. The trial court is directed to complete a determinate abstract of judgment in accordance with this opinion and to forward a certified copy thereof to the Department of Corrections and Rehabilitation. As modified, the judgment is affirmed.

    /s/
Duarte, J.

We concur:


    /s/
Raye, P. J.


    /s/
Hull, J.